Filed 2/22/22  P. v. Galeana CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079000 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD198265) |
| AZUL PENALOZA GALEANA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Jay M. Bloom, Judge.  Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 2006, Azul Penaloza Galeana and her husband were charged with a number of offenses in the death of Galeana's child.  Galeana was charged with murder (Pen. Code,[1] § 187, subd. (a)), with the special circumstance of torture also alleged (§ 190.2, subd. (a)(18)) as well as other felony offenses.

---

[1]     All further statutory references are to the Penal Code.

In 2007, Galeana entered into a plea agreement in which she pleaded guilty to second degree murder and the remaining charges and allegations were dismissed. She was sentenced to an indeterminate term of 15 years to life in prison.

In her change of plea form, Galeana stated: "Having a legal duty to protect, I knowingly and willfully failed to protect my biological child, a three year old girl from violence by another that resulted in her death. By failing to protect her, I aided and abetted her murder."

In 2019, Galeana filed a petition for resentencing under section 1170.95. The trial court appointed counsel, received briefing, issued an order to show cause and conducted an evidentiary hearing. At the conclusion of the hearing, the trial court found beyond a reasonable doubt that Galeana acted with implied malice and was not eligible for relief under section 1170.95. The court denied the petition.

Galeana filed a timely notice of appeal.

Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) indicating that counsel has not been able to identify any arguable issues for reversal on appeal. Counsel asks the court to review the record for error as mandated by *Wende*. We offered Galeana the opportunity to file her own brief on appeal, but she has not responded.

STATEMENT OF FACTS

Appellate counsel has prepared a lengthy statement of facts taken from the materials submitted at the evidentiary hearing. We find the statement to be accurate and will incorporate it here for convenience.[2]

---

[2]     We do so in nearly verbatim fashion except to sometimes use first names and/or initials in naming third parties involved in the subject offense to protect privacy as much as possible.

"Preliminary Hearing Testimony

"Galeana was mother to a five-year-old boy, [J.R.], and twin three-year-old girls, [L.R.] and [M.R.] . . . . In April 2006, Galeana, her three children, and her husband, Jorge Galicia, [lived] in San Diego. Galeana and Galicia had gotten married in [February] 2006. Galeana's mother, Martha, lived in Riverside and seen Galeana's children twice since they moved to San Diego at the end of 2005. Martha watched the children for a couple of weeks in January 2006. There were no signs on them then to suggest they were being abused.

"On Monday, April 10, 2006, between 10:00 a.m. and 11:00 a.m., Galeana called Martha, told her that [M.R.] was sick, and asked her to take [M.R.] to the doctor in Tijuana. Galeana said she had taken [M.R.] to the doctor in San Diego, but still wanted her taken to Martha's doctor in Tijuana. Martha agreed to go with them, but when Galeana said she had misplaced her permanent resident card and could not cross the border, Martha said she would take [M.R.]. Martha picked up [Y.R.], her 13 year-old son, and [Ya.R.], her 11 year-old daughter, from school before 1:00 p.m. and they drove to San Diego.

"When Martha arrived, Galeana greeted her at the door with two of her children and told her that [M.R.] had fallen down the stairs. [M.R.] was in the living room, lying on a mattress, with a towel in her mouth. She was moaning, but not conscious, and her eyes were very dark purple. Martha saw her and started to cry. They were there about five minutes before [Y.R.] carried [M.R.] out to the car. [Y.R.] tried to make [M.R.] more comfortable in the car, but she was stiff, flat like a board, and could not bend. On the way to Tijuana, [Y.R.] checked to see if [M.R.] was still breathing.

3

"Dr. Jose Mapula was not at his office when they arrived. However, Angelica, his wife and office assistant, was, and when she saw that [M.R.] was not conscious and her jaw was locked, Angelica and her brother drove [M.R.] to the hospital. She also called her husband and Dr. Octavio Pisano, a neurosurgeon.

"Dr. Mapula and Dr. Pisano examined [M.R.] when she got to the hospital. [M.R.]'s body was very stiff. She had bruising to the sides of both eyes, traumatic injury on the top of her head, multiple marks on her head and body and head, and she was unconscious or comatose. A U-shaped mark on her right side looked like it may have been caused by being beaten with a belt buckle. Dr. Pisano opined that [M.R.]'s injuries did not all happen at the same time; the oldest bruises were perhaps a week old.

"Martha spoke to Galeana by phone and told her that the doctors suspected [M.R.] had been abused, and her injuries were not caused by falling down stairs.

"After the doctors' initial exam, [M.R.] had x-rays and a brain CT scan. On the CT scan, Dr. Pisano noted a series of small spots in the brain and a small blood stain on the cerebellum tent, near the superior longitudinal sinus, evidence of arachnoidal or brain bleeding. The brain injury had occurred within the previous three days. These injuries are common in traumas in which the brain is stopped abruptly and collides with the bone structures at the base of the cranium. Dr. Pisano opined that [M.R.]'s stiffness was due to seizures caused by a massive brain edema and the defused axonal injury. Nothing could be done to prevent death if there was a thrombosis to the superior longitudinal sinus and also a diffused axonal injury.

"[M.R.] was treated with intravenous fluid and anti-inflammatory medication to reduce the cerebral edema and seizures.  By the second day, [M.R.] seemed to be breathing better, and although she never regained consciousness, Dr. Pisano noted she had less stiffness and the bruising was fading by Wednesday.  He was surprised when her condition became very serious, and he was called back to the hospital.  When Dr. Pisano got to the hospital at 12:30 p.m., a cardiologist and an internist were trying revive her, without aggressive resuscitation efforts, but she died at 1:30 p.m.

"On Thursday, San Diego homicide detective Maria Rivera arrived at the morgue in Tijuana after Dr. Guillermo Uribe had completed the autopsy, but Rivera was permitted to examine [M.R.]'s body.  Dr. Uribe discussed his findings with Rivera, and then Rivera returned to San Diego with a copy of Dr. Uribe's autopsy photos and report.

"Galeana and Galicia were already at the police station when Rivera returned.  Galicia was questioned and denied ever hurting or abusing the children.  He said that [M.R.] fell down the stairs on Friday, April 7, and she was okay except for a little bump on her forehead.  On Sunday evening, [M.R.] screamed and then fainted.  Galicia revived her, and after she fell asleep, they kept an eye on her.  On Monday morning, Galicia again heard [M.R.] scream, and he saw she was very stiff and her jaws were clenched.  He put a cloth in her mouth to keep her from biting her tongue.

"Galeana was questioned and admitted that she had pulled [M.R.]'s hair, and spanked her with her hand, a tennis shoe, a slipper, and a cloth belt, but not a belt buckle.  She denied hitting [M.R.] in the head or face.

"Some time later, detectives left Galicia and Galeana alone in a police car equipped with a microphone and voice recorder.  Both Galicia and Galeana, but more so Galicia, were saying things like, 'Don't tell them the

5

truth, because I will not tell them the truth.  I'm going to stick to what I have told them.'  Galicia warned Galeana that the police were telling her false things, such as that he raped [M.R.], so she would get mad and tell the truth.  He repeated that he would not tell the truth and would stick to the story that they never hit [M.R.].  Galeana said that she was also going to stick to the story.  She told Galicia that she told the police that [M.R.] was injured when she fell down the stairs, the story they agreed to.

"Dr. Glenn Wagner, M.D., the San Diego County Chief Medical Examiner, performed a second autopsy on [M.R.] on April 18, 2006, and reviewed reports and photographs, including from the doctors at the hospital and the medical examiner in Tijuana.  Full-body x-rays showed no evidence of skeletal injuries, old or recent.  On his external exam, he noted bruising of various ages, two to three weeks old, but they were mostly recent, within hours or days of arriving at the hospital.  He observed bruising on her forehead and around both eyes, known as periorbital hemorrhages; there was bruising on her lips and the frenulum was torn.  There were bilateral, symmetrical circular marks behind the ears that were consistent with being grabbed by the ears.  Dr. Wagner noted marks that looked like a belt buckle on her torso.  He also observed some discoloration of the external genitalia, bruising of the legs, pelvis, and abdomen.  He also noted bruising in the vaginal vault, injuries that would support a finding of penetration by something small and sharp, like a finger and fingernail, a pencil, or a stick, but not a penis.  The bilateral bruising of the eyes is typically be seen with skull fractures, but there was no evidence of a skull fracture; these bruises could also have been caused by direct blows to the eyes.

"The photos from the first autopsy showed areas of bruising on the underside of the scalp at least four separate impact sites.  There was an

6

impact-caused injury to the scalp, including subdural and subarachnoid hemorrhage in the bruise in the back of the head, and Dr. Wagner noted that the brain tissue there should be white but instead was colored with blood. Dr. Wagner noted that in the area where the buckle injury is seen, internally, the spleen showed subcapsular hemorrhage. It is also associated with the position of hemorrhages and injury to the spinal cord, caused by a concentrated force, as in a severe bending of the torso forward or backward that can cause paralysis.

"Based on his examination, Dr. Wagner concluded that [M.R.] was a battered child whose presenting history and physical findings did not match. He found the cause of death was cranial-thoracic blunt force injuries caused by another person. In his opinion, these injuries were not caused by falling down stairs. Among other things, the bulk of the injuries were in the back of the head, so she would have had to fallen backwards and struck her head multiple times at multiple angles, but there are other injuries to other protected areas, such as the spine and back of the ears, that were not explained by falling.

"Change of Plea

"Galeana entered into a plea agreement in which she pleaded guilty to second degree murder and in exchange, all other charges and allegations were dismissed. Galeana agreed that the factual basis for the plea was that she had a legal duty to protect her three-year-old biological child, [M.R.], but knowingly and willfully failed to protect her from violence by another that resulted in her death, and by failing to protect her, she aided and abetted her murder.

"Initial Parole Consideration Hearing

7

"At the initial parole suitability hearing on September 27, 2019, Galeana told the board that she did not have the skills to be a mother and took out her anger and stress on her children. She beat them, yelled at them, called them names, and pushed them away. She did not care for them beyond the basic needs of food and shelter. After she and Galicia moved to San Diego, he became more jealous and controlling, but Galeana understood this as his love and fear of losing her. Then, Galicia started beating her. It progressed from slapping her during arguments to choking her. But, Galeana's mother had warned her that she would not make it on her own and would drag herself home needing help. Galeana insisted on proving her mother wrong and was too proud to ask for help.

"Galicia began telling Galeana that her children were out of control, that they were bad kids and did not respect her or him in his role as man of the house. Galeana was used to pleasing Galicia by giving him what he wanted, so she gave him the power to control her children. He began yelling at them and kicking them, and then it turned into torture. and constant, daily abuse. Galeana knew she had chances and opportunities to stop him, but she said she was a selfish coward by pleasing him instead of helping her children. Galeana felt bad about Galicia abusing her children, so she had stopped beating them herself, but she continued to yell at them so they would not disturb Galicia. Everything Galeana did was to please Galicia, because she was afraid to lose him.

"Galeana told the board what happened in the days before [M.R.] died. On the Saturday before she died, Galeana was making dinner, when [M.R.] said she did not want what Galeana was making. Galicia immediately grabbed [M.R.] and yelled at her that she was not special and could not choose what she would eat. He grabbed [M.R.] by her neck, from behind, and

8

dragged her to her place at the table, told her to eat what was on the plate, and slammed her face down on the plate. [M.R.] screamed, and Galicia hit her with his fist very hard on the top of her head.

"Galeana was frozen and afraid of who else would get beaten up. She knew the beating would get worse if she tried to stop him, so that was not an option. She stood in the doorway, watching at him hurting [M.R.]. Galeana admitted she could have gone to the door and yelled for help, but did not, because she was afraid of losing him.

"[M.R.] fell to the floor. Galicia grabbed her from the floor by the back of the neck, sat her on the chair, and repeatedly hit her on the head. [M.R.] kept crying. Galicia grabbed her and took her to her room, and Galeana followed them. Galicia threw [M.R.] into the room and closed the door behind him. Galeana heard Galicia throw [M.R.] against the wall. Then, he came out and told her to let [M.R.] be, because she was just being dramatic. Galeana was again a 'selfish coward.' She did nothing to help [M.R.] and went along with Galicia.

"When they left [M.R.]'s room, Galicia pulled Galeana into their room. A few hours later, after Galicia was asleep, Galeana went to check on [M.R.] to see if she was still alive. Galeana knew the beating was really bad, and she knew [M.R.] could have been dead. [M.R.] was awake and said her head hurt, so Galeana gave her Tylenol. Galeana could have gotten her help then, but she did not.

"There was an awkward silence in the house on Sunday. Galicia was packing and not talking to Galeana or the kids, so they stayed out of his way.

"On Monday morning, Galeana noticed that [M.R.] was not up with the other two children. Galeana checked on [M.R.] and found her body was stiff, and her tongue was sticking out. Galeana yelled for Galicia and said they

9

needed an ambulance, but he yelled back that they were not calling an ambulance and they would fix it. Galicia directed Galeana to get a rag to put [M.R.]'s tongue inside her mouth, but her jaw was locked. Galeana repeated that they needed to call the police and get [M.R.] an ambulance, but Galicia said they were not doing that, that he was not going to jail, and that Galeana was going to jail if she called.

"Galicia later told Galeana to call the doctor in Tijuana. Galeana did not tell the doctor everything, but he told Galeana to take [M.R.] to the hospital. Galeana again told Galicia they had to take [M.R.] to the hospital, but he said no and was getting angry. Then, at Galicia's direction, Galeana called her mother, told her the story they came up with– that [M.R.] fell down the stairs–and asked her to take [M.R.] to the hospital. When Martha got there, Galeana had another opportunity to tell her mother the truth but did not.

"Galeana lied to Martha about why she wanted [M.R.] to go to Tijuana and that she could not go with them because she could not find her green card. But at the parole board hearing, she said the truth is that she wanted to avoid getting in trouble with the law in California. When Martha called Galeana from the hospital and told her the doctors were saying that [M.R.] had been abused, Galeana continued to lie to protect herself and Galicia. When [M.R.] died and the police questioned her, she continued to lie. Galeana even lied after she learned from the autopsy that [M.R.] was also being sexually abused, which she had not previously had known. She even lied after she learned Galicia made the other two children touch him, because it was about protecting herself, not her children.

"Galeana told the board that she finally revealed the truth in 2010 to her mentor. She now felt disgust and sick about putting her children through

10

all of it and causing [M.R.]'s death, and she knew it was a feeling she was going to feel forever.

"Following the initial parole suitability hearing on September 27, 2019, the Board of Parole Hearings found her suitable for parole, but the governor reversed the Board's decision. At her subsequent parole suitability hearing on February 25, 2021, Galeana was again found suitable for parole."

DISCUSSION

As we have noted, appellate counsel has filed a *Wende* brief and asks the court to review the record for error. To assist the court in its review, and in compliance with *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel has identified the following possible issues that were considered in evaluating the potential merits of this appeal.

1. Whether following amendments to sections 188 and 189, can a person who did not personally or physically cause physical injuries still be liable for implied malice murder as the actual perpetrator and also as an aider and abettor.

2. Whether the failure to protect a child when there is a parental duty of care still be a valid basis for liability for aiding and abetting murder following changes to sections 188 and 189.

3. Whether exhibits 6 and 7, the risk assessment report and parole board hearing transcript, admitted in violation of the Evidence Code or the Fifth Amendment rights.

4. Whether there was proof beyond a reasonable doubt, based on admissible evidence, that Galeana's conviction for second degree murder as a direct aider and abettor of implied malice murder or as a direct perpetrator of implied malice murder that rendered her ineligible for relief under section 1170.95.

11

We have reviewed the entire record as required by *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Galeana on this appeal.

DISPOSITION

The order denying Galeana's petition for resentencing under section 1170.95 is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.

12